20 A.3d 421

IN THE MATTER OF RICHARD J. SIMON,
AN ATTORNEY AT LAW.

Argued May 3, 2011—Decided June 9, 2011.

*Janice L. Richter,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Joseph J. Benedict* argued the cause for respondent (*Benedict and Altman,* attorneys; *Mr. Benedict* and *Philip Nettl,* on the brief).

Judge STERN (temporarily assigned) delivered the opinion of the Court.

This ethics proceeding involves the age-old conflict between an attorney's obligation to represent a client diligently and effectively, on the one hand, and the need to collect payment for the representation, on the other. Specifically, we must address whether respondent, Richard J. Simon, violated *RPC* 1.7(a)(2) by suing his client, while still representing him, allegedly in order to preserve property which could be used to pay for his services. We conclude that there was a clear violation of the *Rule* and ethical standards, but limit the discipline imposed based on the totality of circumstances. However, we take this opportunity to emphasize that any future suit by an attorney against a current or existing client in an effort to withdraw from litigation shall not be tolerated.

## I.

The matter was heard by a hearing panel of the District VIII Ethics Committee (DEC), *see Rule* 1:20–6 (governing composition of the DEC hearing panels), on a stipulated record that included the following critical facts:

Respondent was contacted by Julio Sierra to represent Sierra's brother, Angel Jimenez, who was charged with murder [and other offenses] and held in the Middlesex County Detention Center in lieu of bail. Respondent had known the Sierra family for many years. [Respondent believed Julio Sierra to be a financially responsible person who was prepared to pay for his brother's defense, and that Angel Jimenez was not personally able to afford private counsel.] [1] A retainer agreement was signed by Sierra, Jimenez and Jimenez' mother, Celida Sierra. Respondent received an initial $5,000.00 retainer from Julio Sierra and another $5,000.00 from Julio Sierra in September, 2005 after defendant's indictment. The retainer agreement set [r]espondent's hourly rate at $325.00, and provided that [r]espondent could end his representation if the individuals failed to make payment.

Respondent provided legal services to Jimenez from March, 2005 through August, 2008. The defendant was indicted in March 2005,[2] and arraigned on a superceding indictment on August 12, 2007. Respondent maintained contact with the Sierras, who attended many of the court appearances. On July 25, 2007, [r]espondent met with Julio Sierra and discussed his outstanding legal fees. This meeting was confirmed in a letter dated July 26, 2007. In that meeting, [r]espondent *informed Sierra of more than $50,000.00* in outstanding legal fees, fees that [r]espondent wanted paid. Sierra asserted that he was going to refinance his property located at 365 Grove Street, Perth Amboy, New Jersey, and agreed that [r]espondent would be paid the $50,000.00 at the time of the refinancing. Based upon this agreement, [r]espondent continued to provide legal services to Jimenez.

In early January, 2008, Sierra told [r]espondent that he could only pay [r]espondent $10,000.00 from the refinancing, but would pay the remaining fees at a later date. Respondent confirmed this in a January 4, 2008 letter. In March, 2008, [r]espondent received an additional $10,100.00 from defendant's brother, however the funds came from Sierra's sale of the property, not its refinancing. By that time [r]espondent had billed over $70,000.00 in fees, and had incurred $13,846.57 in costs, but had been paid only $20,764 in fees. Respondent placed calls to Sierra seeking payment of the outstanding balance.

On May 1, 2008, [r]espondent sent an itemized invoice to Sierra. On June 10, 2008, [r]espondent was told by defendant's brother that there "was no more money", and that Angel should "take a plea". On June 23, 2008, [r]espondent

---

[1] The bracketed material is an amended footnote from the stipulation.

[2] By virtue of the indictment number and filing date, it appears that the indictment was returned in June 2005.

wrote to defendant's mother and brother, copying defendant, that they now owed him over $66,000 and that he could not continue on as Angel's attorney without payment. In that letter [r]espondent informed them that he was going to make application to the court to be relieved as counsel. Invoices were sent to the client and his family on May 1, 2008; June 20, 2008; July 1, 2008; and August 28, 2008. A letter accompanied each invoice advising of [r]espondent's intent to file a motion to be relieved as counsel if payment was not arranged, and also providing the Sierras and Jimenez with their right to file for Fee Arbitration.

Respondent also informed them, by regular and certified mail, that if payment were not received, he intended to sue for it[.]

## The stipulation continued:

In early July, 2008, [r]espondent filed a motion to withdraw as counsel, on the basis of non-payment of fees and a breach of the attorney/client retainer agreement. Attached to his motion were the letters sent to the Sierras and Jimenez informing them of his intent to sue. No opposition was filed by the Middlesex County Prosecutor's Office. At the time the motion was filed, no trial date had been set by the [c]ourt. The motion was not heard until the end of August, 2008, and was heard by [the trial judge]. At the motion argument, the Prosecutor for the first time voiced objection to the [m]otion. [The judge] denied the motion and, after discerning the attorneys' schedules, set the trial date for December, 2008. At the hearing, [r]espondent indicated his intent to appeal the [j]udge's ruling. The defendant, [r]espondent's client, attended the hearing but was not asked whether or not he wanted [r]espondent to continue to represent him.

Respondent did appeal the [j]udge's denial of his [m]otion to [w]ithdraw, and also filed suit against his client and his client's family for his legal fees. Respondent also asked the [c]ourt to [s]tay the [t]rial pending the appeal.

Respondent learned that his client's family had transferred their home to another family member for nominal consideration, an action [r]espondent presumed was to avoid his obtaining a judgment on it. When [r]espondent's client learned of the lawsuit, he wrote the [j]udge asking for another attorney. When the [j]udge learned of the lawsuit, he amended his prior order and relieved [r]espondent as counsel for Angel Jimenez.[3]

Respondent was ready to proceed with the criminal matter, regardless of the lawsuit. He did not withdraw from his representation of the defendant, and asserted to the [c]ourt that he was ready to try the case.

[Exhibit numbers omitted.]

By order dated October 10, 2008, the judge, in relieving respondent as defendant's counsel, stated that he was "satisfied that given the filing of [the] lawsuit by [respondent] against his client any further representation of the defendant by [respondent] is

---

[3] As a result, respondent withdrew his appeal or, more properly stated, his motion for leave to appeal.

impossible." The judge then referred the matter to the Office of Attorney Ethics (OAE).

On August 29, 2008, respondent filed a civil complaint for fees against defendant, defendant's brother, and their mother in the amount of $74,691.50. Respondent filed an amended complaint on September 23, 2008, that addressed allegations of the allegedly fraudulent transfer by defendant's brother of his property, the proceeds from the refinance of which were supposed to be used to pay respondent's fee. The amended complaint added George Sierra and Rafaela Vargas, the transferees of the property, as defendants. Respondent subsequently filed a second amended complaint on October 3, 2008, to update the amount of payment he sought to $86,961.25.

In May or June 2009, respondent was awarded approximately $55,020 in fee arbitration with defendant's brother and mother. It does not appear that award was actually paid.

## II.

Before the DEC hearing panel, the OAE contended "that a conflict of interest occurs when an attorney sues an existing client while the attorney is defending that client against the charge of murder," and that respondent therefore "violated [*RPC*] 1.7(a)(2) when he filed civil litigation against his client for unpaid legal fees, while continuing to represent that client against criminal charges." The OAE also expressed concern about the administrative impact on the court system if attorneys are permitted to create unwaivable conflicts of interests in order to be relieved as counsel. In response, respondent believed he satisfied the applicable rules by serving pre-action notices under *Rule* 1:20A–2 and *Rule* 1:20A–6 and not expecting payment from defendant, his client—as opposed to his client's mother and brother. Respondent further claimed that his lawsuit had to be filed expeditiously to "prevent any further fraudulent conveyances" and that he complied with the ethical rules because the civil complaint did not "cross the ethical threshold." Respondent believed that he did not violate *RPC*

1.7(a)(2) because he did not think that his representation of defendant would be affected thereby.

On May 24, 2010, a hearing was held before the DEC hearing panel. The parties' arguments were consistent with their briefs. The OAE began by noting that New Jersey law "is not that clear" regarding an attorney's right to sue a present client. For the OAE, this type of suit is a conflict of interest, but "there may need to be a decision made further up the line ... about whether or not this does cross the ethical line," and if so, whether respondent was on notice of that. Recognizing various possible DEC decisions with regard to the ethical nature of this conduct, and whether discipline was even warranted, the OAE called for "clear direction" on the issue.

Respondent agreed as to the "dearth of law on this issue in New Jersey." However, he argued that he acted properly by: (1) sending a pre-action notice consistent with *Rule* 1:20A–6; (2) moving to withdraw as defendant's counsel and seeking leave to appeal the denial of the motion; and (3) remaining prepared to try the case. He reiterated that he never expected payment from defendant, the client, and that, in his view, he did not have a "personal interest" adverse to his client implicated by defendant's brother and mother's nonpayment. Respondent also cited to out-of-state law, noting the rule against suing a current client exempted actions for fraud or "gross imposition." He argued that both exceptions were met, should that rule apply here.

Respondent also testified before the DEC hearing panel. He described the initiation of his representation of defendant. He explained that in July 2007, defendant's brother promised payment of the outstanding fee balance from a proposed refinance of one of his properties. The next year, defendant's brother drastically changed the amount he said he could pay respondent—from $50,000 to $10,000. Respondent later realized defendant's brother had made misrepresentations to him with regard to the sale of the property. He also described events, as previously detailed, leading to the judge's denial of his motion to withdraw, suggesting that

he "could have just [as] easily dismissed [defendant] from the lawsuit as [he] put him in the lawsuit, but it was part of the notice because the rule required you to put a 30 day action notice on the client if you are going to file a civil action." Respondent claimed he named Jimenez as a defendant in his suit only because of the retainer agreement which served as the underlying grounds for relief.

Ultimately, the DEC hearing panel concluded that respondent had violated *RPC* 1.7(a)(2) and recommended a six-month suspension. According to the hearing panel, respondent's conduct "created a conflict of interest of such magnitude that the trial [j]udge was left with no alternative but to relieve [r]espondent as counsel upon learning that [he] had sued his client over legal fees." The hearing panel thought it "readily apparent" that respondent's suit was "for the express purpose of being let out of the case when his efforts failed at the motion hearing" and constituted "particularly abhorrent" conduct given the serious charges the client faced and the long period he had already been incarcerated—three years. While recognizing the dearth of case law on the issue, the hearing panel noted that, pursuant to *Pellettieri, Rabstein, & Altman v. Protopapas*, 383 *N.J.Super.* 142, 153, 890 *A.*2d 1022 (App.Div. 2006), a claim by an attorney for unpaid fees does not accrue until after the conclusion of the case or the termination of the attorney-client relationship. However, here, respondent still represented defendant when the suit was filed, and any argument that defendant was an unnecessary party was unconvincing because "[i]f that were true, then [r]espondent should have omitted his client from the lawsuit." Thus, the suit led to "an actual conflict of interest and a divided loyalty situation." The hearing panel found the specter of administrative disruption, as a result of attorneys creating such conflicts, persuasive, noting that it was "important for the proper administration of justice that a clear message be sent to the bar that suing an existing client violates ethical rules and will not be tolerated in New Jersey."

## III.

Before the Disciplinary Review Board (DRB), the OAE maintained that respondent had created a conflict of interest under *RPC* 1.7(a)(2) in suing an existing client. Citing several cases from other states, the OAE recognized that "[t]he dearth of law . . . creates an area of doubt for the practitioner." Acknowledging that *Rule* 1:20A–6 was not clear on whether a current client could be sued, the OAE suggested that an amendment to the *Rule* may be necessary.

Respondent countered that he "followed every clear rule that was available regarding the procedures for suing a client." He claimed that if a rule prohibited suits against current clients, he would have complied. Respondent conceded, however, "that he exercised poor judgment in naming his client as a defendant in a civil action for a fee," as it could create "the appearance of a conflict" of interest. On the other hand, in so conceding, he also noted that his conduct did not actually violate *RPC* 1.7(a)(2) because he included defendant in the collection action in good faith only as a "necessary party" and not because he sought payment from defendant. He also believed that any curative rule amendment should be "applied prospectively."

The DRB upheld the DEC hearing panel's findings. It determined "that the DEC's conclusion that respondent's conduct was unethical [to be] fully supported by clear and convincing evidence." The DRB stated that, "[o]bviously, by suing an existing client, respondent placed himself in an adversarial position vis-à-vis the client, a situation that jeopardized his duty to represent [defendant] with the utmost zeal." The DRB found unpersuasive respondent's argument that he never expected payment from defendant and could have dismissed him from the suit because "a conflict of interest" would still "have emerged." It also rejected the notion that guidance was necessary because no guidance is needed for something so "axiomatic." Thus, for the DRB, "despite the paucity of rule or law on the subject—or precisely because of it—the basic truth is that lawyers cannot sue present

clients without immersing themselves in an untenable conflict of interest."

In sum, the DRB concluded that "respondent could not have reasonably thought that suing a client raised no conflict of interest problems" and the question is not a "novel" one in this state. The DRB discussed two cases it viewed as sufficiently analogous, both of which imposed a reprimand on the respondent attorney involved.[4] According to the DRB, those cases "made it clear that, when an attorney asserts a personal claim against a present client, their interests necessarily become antagonistic."

Given the existence of a conflict of interest, the DRB next discussed the appropriate discipline. It noted that, generally, a reprimand is "standard" discipline for conflicts of interest. However, it explained that, although " 'egregious circumstances' " or " 'serious economic injury to the clients involved' " can increase the discipline, citing *In re Berkowitz*, 136 *N.J.* 134, 148, 642 *A.2d* 389 (1994), certain mitigating circumstances may justify that discipline be adjusted downward to an admonition. Applying that weighing process, the DRB determined a downward adjustment would be inappropriate in this case because defendant's trial was delayed due to respondent's conduct and respondent's act of suing a current client "facing murder charges" constitutes "the sort of conduct that, regrettably, contributes to the lack of confidence that members of the public at times display toward the judicial system." Thus, the DRB concluded that—despite respondent's thirty-one years of unblemished membership in the New Jersey bar—a reprimand was warranted.

## IV.

We granted respondent's petition for review pursuant to *Rule* 1:20–16(b). *IMO Richard J. Simon*, (D–51) (March 22, 2011).

---

[4] *See In re McDermott*, 142 *N.J.* 634, 667 *A.2d* 692 (1995); *In re Loring*, 62 *N.J.* 336, 301 *A.2d* 721 (1973).

In that petition for review, respondent presents three questions: (1) whether his conduct was a conflict of interest in violation of *RPC* 1.7(a)(2) under the circumstances; (2) whether "there exists a *per se* prohibition on suits against current clients," and, if so, whether the rule should apply "only prospectively"; and (3) whether an admonition—as opposed to a reprimand—would be the proper discipline.

First, respondent argues that there is no blanket prohibition on suits by lawyers against current clients and that, in any event, his dispute was with defendant's brother, not with his client, the defendant. He asserts that he had an obligation under *RPC* 1.16(c) to continue representing defendant until relieved and did so. In respondent's view, any "attempt to collect legal fees from a defaulting client is, by its very nature, a precarious situation for an attorney to be in" and creates "an adversarial position" between the attorney and his client, who is owed a duty of loyalty, regardless of whether the representation "is completed or ongoing." He contends that the only limitation on suit against a client is the *Rule* 1:20A–6 pre-action notice that he in fact provided and that "the dearth of guidance" on this topic does not, in his view, mean that the conflict is "so obvious it need not be" expressly prohibited. He analogizes to other situations in which a prohibition on conduct, or a rule requiring an attorney to act in a certain way, would seem obvious but is still governed by statute or rule.

Second, respondent argues that a rule prohibiting a suit against a current client because of a conflict of interest should apply only purely prospectively, as he complied with what he considered the currently available procedures: (1) he served the appropriate pre-action notice; (2) he moved to withdraw as counsel while explaining his reasons to the court; and (3) he filed suit only after the required waiting period. Although conceding that "he could have erred on the side of caution, given the ambiguity of the rule, and avoided the appearance of a conflict," he asserted that "he was acting in good faith." Respondent re-emphasized that he sued defendant because he thought he was "a necessary party," even

though there was never an expectation of payment from him, and believed that the order denying him leave to withdraw as counsel "already contemplated" his filing the suit. Thus, applying the rule to him to impose discipline would, in his view, be "unfair[ ]."

Third, respondent posits that the appropriate discipline, if any, should be an admonition. *See R.* 1:20–15A(a)(6) (defining admonition as the lowest rung of public discipline). He points to his thirty-one years at the bar without discipline and lack of intention to disadvantage his client and suggests he did not act in a self-interested fashion in defendant's case. In further support of an admonition as the appropriate level of discipline, respondent cites to the "absolute transparency" with which he acted in this matter.

The OAE continues to assert, as it did before both the DEC hearing panel and the DRB, that a conflict of interest arose due to respondent's actions but that the *Rule* needs clarification.

## V.

■ *RPC* 1.7(a) provides that, unless certain conditions (enumerated in *RPC* 1.7(b)) are met, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." *Ibid.* One such conflict occurs upon "a significant risk that the representation of one or more clients will be materially limited by ... a personal interest of the lawyer." *RPC* 1.7(a)(2).[5] *RPC* 1.7(b) allows the lawyer to represent the client "[n]otwithstanding the existence of a concurrent conflict of interest under paragraph (a)" under certain conditions and where "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client."

---

[5] Similarly, section 121 of the *Restatement (Third) of the Law Governing Lawyers* (2000) (*Restatement*) defines a conflict of interest as arising "if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person."

At issue here is whether filing suit against a current client to collect a fee creates an untenable conflict under *RPC* 1.7 between the lawyer's duty to that client and the lawyer's "personal interest" in collecting his or her fee. As a general matter, "[a]ttorneys have the right to sue in a court of law on a contract basis for a fee owed" and "also have recourse [to common law and statutory] liens to secure a fee." *See* Kevin H. Michels, *New Jersey Attorney Ethics: The Law of New Jersey Lawyering,* § 37:1–1 (2011). The present case involves a suit filed on a contract basis while representation was ongoing and does not involve a lien of any type; therefore, this opinion does not address situations involving liens. However, a lawyer's responsibilities under the various *RPCs* (including conflict-of-interest rules) impact a lawyer's fee-collection methods. All methods of collecting a fee, including "the right to sue in a court of law on a contract basis," "are subject to an overriding caveat: an attorney's violation of the [*RPCs*] in connection with the representation of the client from whom the fee is sought 'may jeopardize that attorney's right to collect fees for services rendered.'" *Ibid.* (quoting *Straubinger v. Schmitt,* 348 *N.J.Super.* 494, 500, 792 *A.*2d 481 (App.Div.2002)). Thus, the fee-collection process is governed by the conflict-of-interest rules.

The *Restatement* likewise makes clear that a lawyer's remedies against a client are limited by both the law governing the remedy in question and the lawyer's obligations under any applicable ethical code. Section 7 of the *Restatement* states that "[a] lawyer may obtain a remedy based on a present or former client's breach of a duty to the lawyer if the remedy: (1) is appropriate under applicable law governing the remedy; and (2) does not put the lawyer in a position prohibited by an applicable lawyer code." The commentary further explains that subsection (2) "recognizes that special limitations on such remedies may be appropriate in view of what the tribunal may properly determine to be overriding considerations arising from appropriate enforcement of a lawyer-code provision applicable to the lawyer." *Id.* at § 7 comment. a. Thus, even if a lawyer may seek a remedy from a present client

that is otherwise permitted by law, that remedy is unavailable if the "applicable lawyer code"—here, the *Rules of Professional Conduct*—would prohibit it. *See ibid.*

Outlining the rationale for limiting a lawyer's avenues of relief against his or her client, the *Restatement* commentary additionally explains that "[a] lawyer seeking relief from a present or former client is not in the same position as are most other claimants with respect to responding parties"; rather, there is a fiduciary relationship, which "includ[es] duties of the utmost good faith and fair dealing." *Id.* at § 7 comment b (citing § 16). The commentary specifically indicates that these duties "may also be appropriate to" consider "when assessing the suitability of an otherwise-available remedy," such as "fee-collection methods." *Ibid.*

While a lawyer's interest in being paid does not itself "create an impermissible conflict" under *RPC* 1.7(a)(2), his or her "conduct is subject to scrutiny when the effort to collect a fee from a client becomes adversarial." Michels, *supra,* § 19:3–2(a); *see also id.* § 37:6–1 (discussing coercion within section on "[f]orbidden [c]ollection [p]ractices"). Here, as the DRB points out, by filing suit against his client for unpaid fees while defending that client against murder charges, respondent violated *RPC* 1.7(a)(2) by placing himself in an adversarial relationship vis-à-vis his client and thus "jeopardiz[ing] his duty to represent [his client] with the utmost zeal."

Respondent's arguments to the contrary are not persuasive. Given the clarity of our *RPCs*, there can be no legitimate confusion about a lawyer's ability to sue an existing or current client.[6] Respondent's first complaint against his then-current client sought fees and did not address an alleged fraudulent transfer of property; even respondent's subsequently amended complaints involved

---

[6] There is some authority allowing a lawyer to perfect a retaining or charging lien against a current client, *see Restatement, supra,* at § 41; *see also id.* at §§ 42–43; *N.J.S.A.* 2A:13–5, –6; however, we need not address those concepts as they are not at issue here.

no lien or asserted lien.   To the contrary, respondent's complaint sought reconveyance of a specific piece of realty "back to" Julio Sierra so that his creditors, including respondent, could be paid. Moreover, as the DEC hearing panel and the DRB pointed out, respondent's client, Angel Jimenez, was sued for the legal fees owed, and the suit was commenced by respondent while he was still representing Jimenez, thus creating a divided loyalty and violating *RPC* 1.7(a)(2).

Respondent has also suggested that *Rule* 1:20A–6 does not restrict suits against current clients;  however, respondent's argument does not account for the restrictions our *RPCs* place on otherwise permissible fee collection methods.   Nothing in *Rule* 1:20A–6 suggests that an otherwise interdicted suit may be commenced merely by sending a pre-action notice.   Nevertheless, the OAE points out that *Rule* 1:20A–6 does not limit pre-action notices, or resulting suits, to actions "against a *prior* client" and suggests it may be "necessary" to amend the *Rule* to limit the right of action "against a client to *after* the representation has concluded."   The OAE also states that, "[i]f an attorney is permitted to sue his client for fees while the representation is ongoing, the attorney can force the court to relieve him as counsel by creating an unwaivable conflict, adversely impacting the ability of the Court to manage its cases and case load."   Whether or not the OAE's concern is legitimate, we hold, consistent with the mandate of *RPC* 1.7(a), that attorneys shall not sue a present or existing client during active representation.[7]   Nor shall an attorney seek any remedy against a client which results in a conflict under our *RPCs*.

We emphasize that an attorney may not seek a remedy against a client for the purpose of creating a conflict under our *RPCs* in order to withdraw from a case.   Under *RPC* 1.16(b)(5), an attorney may seek to withdraw if a "client fails substantially to fulfill an

---

[7] We note again that this case does not involve a lien, and our opinion does not address that subject.

obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled." *See also Restatement, supra,* at § 32(3)(g). Further, an attorney must withdraw from representation if it will "result in violation of the *Rules of Professional Conduct* or other law." *RPC* 1.16(a); *see also Restatement, supra,* at § 32(2)(a). However, under *RPC* 1.16(c) an attorney must "comply with applicable law requiring notice to or permission of a tribunal when terminating a representation," and "[w]hen ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation." *See also Restatement, supra,* at § 32(5); *id.* § 32 comment m (discussing withdrawal on ground of avoiding "unreasonable financial burden" on the lawyer, and including New Jersey case law in discussion); *R.* 1:11–2 (dealing with issue of withdrawal and termination of counsel).

## VI.

■ We now apply these principles to respondent's petition for review. Respondent first sought unsuccessfully to withdraw in the face of mounting unpaid fees.[8] However difficult respondent's

---

[8] The impact of the amount of accumulating fees and an attorney's potential ability to collect should be considered in deciding a motion to withdraw or be relieved as counsel. On the other hand, the more time and effort an attorney puts into a case, and the closer the matter is to trial, the more prejudicial it is for the client if counsel is relieved. An attorney should not accept a retainer if he or she believes it cannot be paid if the matter progresses as expected, or merely to do some work and then seek to abandon the case. *See State v. Johnson,* 274 *N.J.Super.* 137, 147–48, 643 *A.*2d 631 (App.Div.), *certif. denied,* 138 *N.J.* 265, 649 *A.*2d 1285 (1994) ("When deciding whether to permit withdrawal, the trial court must balance its inherent and necessary right to control its own calendar and the public's interest in the orderly administration of justice against the attorney's reasons for requesting withdrawal."). *See also Jacobs v. Pendel,* 98 *N.J.Super.* 252, 255, 236 *A.*2d 888 (App.Div.1967) ("The granting of leave by the court is generally in the discretion of the court and depends upon such considerations as proximity of the trial date and possibility for the client to obtain other representation."). The trial judge must balance these factors in considering a motion by counsel seeking to be relieved or withdraw from the case.

situation may have been, the clear inference from the record is that, having been unsuccessful in his efforts to withdraw from his representation of Jimenez, respondent engaged in what amounts to "self help" and filed suit against his client for the purpose of forcing his withdrawal. By filing suit, respondent knowingly created an irreconcilable conflict of interest for that purpose, and that conduct cannot be tolerated.

■ Mitigating respondent's conduct is the OAE's concession concerning a perceived lack of clarity in the *RPCs*. In addition, respondent emphasizes that he: (1) provided a pre-action notice and moved to withdraw before filing the suit; (2) named his client in the action believing him to be a nominal defendant; (3) asserts, without dispute, that he never looked to defendant for payment; and (4) named defendant only because he thought him to be necessary "because he was the client and a party to the retainer agreement" and, hence, an indispensable party. Moreover, weighing heavily in respondent's favor is his unblemished record for more than thirty-one years as a member of the bar. In the aggregate of those circumstances, we elect to defer to the considered and unanimous recommendation of the DRB and impose a reprimand. An order shall be entered to that effect.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

To the extent that the majority reaches the truly unremarkable conclusion that, save for very limited circumstances not relevant here, a lawyer cannot ethically sue a current client, I concur. However, to the extent, in imposing discipline, the majority gives far too little weight to the insoluble quandary in which lawyers find themselves when, already in a financial hole, they are forced to hopelessly continue to dig themselves into a yet deeper and potentially bottomless financial abyss, I must dissent. In my view, the proper resolution of this matter is to adjudge respondent liable for an infraction of the *Rules of Profession Conduct*, but impose no discipline.

Through no fault of his own, respondent Richard J. Simon found himself in precisely that quandary: he already was owed tens of thousands of dollars in fees, with no reasonable prospect of payment; he was facing the likelihood of defending an all-consuming and lengthy murder trial also without hope of payment of his fees; and his entirely proper application to withdraw as counsel had been denied, seemingly without full and complete consideration of those very real and grave concerns. That combination of events was deadly and guaranteed that respondent's financial position would only deteriorate further. For a lawyer in a large firm, those concurrent events would be onerous but perhaps ultimately bearable; for a sole practitioner like respondent—who must bear that burden alone—that combination is likely ruinous.

In those circumstances, respondent's resort to what was no more than commonplace legal process to stem that economic hemorrhage—while at the same time taking steps to insure that his actions did not in fact adversely affect his client[1]—is more fairly gauged as striking a thoughtful and measured balance of what admittedly are difficult and conflicting interests. Although, as a straightforward matter of professional ethics, a lawyer suing a current client cannot be condoned in its entirety, the dire circumstances presented here are fundamentally different from the run-of-the-mill facts our ethical strictures are designed to address and, in the end, are poignantly compelling.

---

[1] It is uncontested that, although he named his client as a party defendant in the law suit seeking payment of his fees, respondent did so for a compelling reason: defendant clearly was an indispensable party to that contract action and the failure to name defendant as a party would have rendered respondent's lawsuit subject to dismissal. *See R.* 4:28–1(a) and (b). It is also uncontested that respondent viewed the joinder of defendant as a party to the collection lawsuit as nothing more than the naming of a nominal defendant, as respondent in fact took no action, and asserted without contradiction that he intended to take no action, against defendant. Finally, the record proves beyond any doubt that, even after respondent had filed his collection action naming defendant as a party, respondent continued unabated his representation of defendant in the murder case with the same high level of skill, dedication and zealousness that had characterized the representation *before* the collection suit was filed.

No doubt, by suing a client he simultaneously was actively representing, respondent ran afoul of *RPC* 1.7(a)'s clear proscription concerning concurrent conflicts of interest. That said, the difficult Hobson's choice with which respondent was confronted deserves a greater and deeper understanding than what it has been given and, more to the point, demands that this Court temper its judgment. For those compelling reasons, respondent's actions in the aggregate, although ethically culpable, do not warrant the imposition of discipline. Therefore, to the extent that, in the circumstances presented in this case, the majority does impose discipline and reprimands respondent, I must respectfully dissent.

*For Reprimand*—Chief Justice RABNER, and Justices LONG, LaVECCHIA, HOENS, and Judge STERN (temporarily assigned)—5.

*For concurrence in part; dissent in part*—Justice RIVERA-SOTO—1.

*Not Participating*—Justice ALBIN.

## ORDER

It is ORDERED that **RICHARD J. SIMON** of **NEW BRUNS-WICK,** who was admitted to the bar of this State in 1979, be reprimanded; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs and actual expenses incurred in the prosecution of this matter, as provided in *Rule* 1:20–17.