234 N.J. Super. 534 (1989)
561 A.2d 275
JUDY A. LA MANTIA, PLAINTIFF,
v.
JOHN F. DURST, R.H. BORGERSEN, AND PAUL KLENOFF, DEFENDANTS. EVANS, OSBORNE & KREIZMAN, ESQS., PETITIONER-APPELLANT-CROSS-RESPONDENT,
v.
MONTE & MARRIOTT, ESQS., RESPONDENT-CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 9, 1989.
Decided June 28, 1989.
*535 Before Judges PETRELLA, GRUCCIO and LANDAU.
Robert J. Kelly argued the cause for appellant-cross-respondent (McElroy, Deutsch & Mulvaney, attorneys).
Thomas D. Monte, Jr., argued the cause for respondent-cross-appellant (Monte & Marriott, attorneys; Thomas D. Monte, Jr., of counsel; Jamie S. Perri, on the brief).
The opinion of the court was delivered by GRUCCIO, J.A.D.
This case typifies a disturbing trend prevalent in the modern legal profession. Petitioner Evans, Osborne & Kreizman (Evans *536 Firm)[1] asserts its claim to an apportioned percentage of a contingency fee realized by respondent Monte & Marriott (Monte Firm)[2] from a personal injury action between plaintiff Judy A. LaMantia and defendants John F. Durst, R.H. Borgersen and Paul Klenoff. The facts of this case are uncomplicated.
In January 1981, as a result of family recommendations, plaintiff contacted Harry S. Evans, the senior partner in the Evans Firm. After an initial consultation with Evans, the partners decided to take the case and subsequently assigned it to Thomas D. Monte, Jr., who had recently become a partner.[3] As is the common practice with medical malpractice cases, the retainer agreement between plaintiff and the Evans Firm provided for a contingent fee arrangement.
Over a period of nearly two years, Monte devoted a substantial amount of his billable hours to developing plaintiff's case. The Evans Firm advanced monies for filing fees, expert testimony and other expenses.
In early 1983, Monte withdrew from the Evans Firm, taking plaintiff's file. A substitution of attorney was subsequently filed in favor of the Monte Firm, together with a cross-motion to preserve an attorney's lien in favor of the Evans Firm. As *537 of that date, the only retainer agreement was that between the Evans Firm and plaintiff.
The underlying lawsuit went to trial in January 1984 and the jury returned a $2.1 million verdict in plaintiff's favor. While pending on appeal, the case ultimately settled for a one-million-dollar lump-sum payment plus a life-time $7,000 monthly annuity.
Thereafter, the Monte Firm filed a motion for an increased fee. A fee of $414,044.42 was awarded, but the ultimate fee paid for services rendered was $404,000.00. Once the attorneys' fee was determined, the respective law firms squared-off for judicial apportionment of that fee. Following arguments of counsel, the motion judge issued a letter opinion dated March 23, 1988. The Evans Firm was allocated a fee of $50,610, representing 337.4 hours of billable time incurred (based upon a $150 per hour billable rate) while the file remained at the firm. The Evans Firm's ultimate recovery, with costs, totaled $52,596.78.
The central issue here is how the contingency fee award should be divided between the Evans Firm and the Monte Firm. We agree with the trial court that the proper measure of a former firm's compensation involves principles of quantum meruit. In re Estate of Poli, 134 N.J. Super. 222, 227 (Cty.Ct. 1975). We question, however, the manner in which the court valued the contributions of the respective firms. Quantum meruit simply means "as much as he deserves," therefore, any distribution of a contingency fee award between two law firms is by its very nature a fact sensitive decision. Indeed, the parties have each presented published Law Division cases involving the fee-splitting issue. In one case, the contingency fee was divided based upon hours worked multiplied by the hourly rate. The other case divided the attorney's fee award based upon a percentage of the recovery.
In Anderson v. Conley, 206 N.J. Super. 132 (Law Div. 1985), the controversy centered around a personal injury case where a *538 resident plaintiff initially obtained New Jersey counsel. Three months later the plaintiff opted to change counsel in favor of a New York firm which promised to obtain a lump-sum settlement. Since the New York firm was not licensed in this State, a second resident New Jersey firm was retained on an hourly basis by the New York firm to litigate the personal injury action. The main issue was whether the New York firm's contingency fee arrangement could be enforced in New Jersey where the compensation under that agreement exceeded the limits under the New Jersey Rules of Court. Ancillary to that issue was the amount of compensation due to the first New Jersey law firm. The court made specific findings of fact and determined that the preliminary work done by the first New Jersey firm did contribute to the resolution of the case. However, in light of the short period in which the firm actually handled the case, the court found that reasonable compensation in quantum meruit could be easily calculated by multiplying their time spent on the case by their normal hourly rate.
In contrast to Anderson is Buckelew v. Grossbard, 189 N.J. Super. 584 (Law Div. 1983), where the court was faced with the proper allocation of a contingency fee award between two firms which worked on the same case in succession. The first attorney attempted to settle the plaintiff's claim for $20,000. Thereafter, he tried the case and lost. Plaintiff then retained different counsel who appealed the trial court's decision to the Appellate Division. After losing on appeal, the second attorney applied for certification to the Supreme Court and ultimately, the case was remanded for a new trial. The matter was then settled by the second attorney for $100,000. The Law Division judge, faced with the allocation issue, looked at the fee arrangement of the first attorney and valued his efforts based upon the $20,000 settlement figure recommended before the first trial. The court then awarded him one-third of that figure in accordance with the initial contingency fee arrangement. In making this allocation, the court noted that the lack of accurate time records by the first firm made it difficult to estimate the value *539 of the work to the ultimate resolution of the personal injury case. Therefore, the court fashioned this figure as reasonable compensation for his efforts in quantum meruit. The court made reference to the questionable quality of the work done by the first attorney. Moreover, the court pointed to the tenacious efforts of the second attorney as the major reason any recovery was eventually realized by the personal injury plaintiff.
New Jersey lacks case law directly on point. New York cases have addressed the issue of the proper valuation of quantum meruit in disputes between incoming and outgoing attorneys. New York refers to the original contingency fee agreement as one factor to determine the value of the outgoing firms' services.
If it is found that a contingent contract exists, then a different rule may apply. After dismissal of the attorney the cancelled contract no longer serves to "establish the sole standard for the attorney's compensation. Together with other elements [it] may, however, be taken into consideration as a guide for ascertaining quantum meruit ..." [Paulsen v. Halpin, 427 N.Y.S.2d 333, 335 (1980), citing Matter of Tillman, 259 N.Y. 133, 135-136, 181 N.E. 75].
New York then distinguishes between outgoing attorney/client and incoming/outgoing attorney disputes. In the latter situation, the outgoing attorney is given an election on the form of compensation he can expect.
Where, as here, the issue is primarily or exclusively between the attorneys and not as between the client and the attorney, the outgoing attorney has the right to elect whether he will take his compensation on the basis of a presently quantum meruit dollar amount, or whether, still on the basis of quantum meruit, he will take a contingent percentage to be determined at the conclusion of the case. [Cordes v. Purcell, Fritz & Ingrao, 89 A.D.2d 870, 453 N.Y.S.2d 237, 238 (1982)].
This approach to disputes between incoming and outgoing firms fits well in this situation. Under such an approach, the award of quantum meruit based only upon billable hours multiplied by rate would be improper. This lends support to the Evans Firm's position on appeal, but does little to help determine what the quantum meruit percentage is.
We realize that when dealing with an equitable determination such as quantum meruit, hard and fast rules are difficult to *540 apply, let alone construct. See Littlefield v. Kearns, 8 N.J. Super. 198, 203 (App.Div. 1950). However, guidelines as to the relevant factors to be considered may assist the trial courts and members of the bar. We, therefore, consider the following issues to be relevant.
Trial courts should consider the length of time each of the firms spent on the case relative to the total amount of time expended to conclude the client's case.[4]State v. U.S. Steel Corp., 22 N.J. 341 (1956). The quality of that representation is also relevant. Hudson Cty. Nat. Bank v. Woodruff, 123 N.J. Eq. 151, 153 (Ch. 1938). Therefore, the result of each firm's efforts as well as the reason the client changed attorneys are factors to be considered. Buckelew, 189 N.J. Super. at 587-588. Viability of the claim at transfer also bears upon the value of a former firm's contribution  if the case was initially speculative *541 but concrete by the time the cause of action moved to the second firm, that factor should bear upon the distribution. Soper v. Bilder, 87 N.J. Eq. 564, 569 (Ch. 1917). The amount of the recovery realized in the underlying lawsuit also impacts upon the quantum meruit valuation. Shaad v. Mousaw, 59 A.D.2d 1061, 399 N.Y.S.2d 822 (1977). It is also necessary to examine any pre-existing partnership agreements between the members of the firms who now compete for a percentage of the contingency fee.[5] Where one attorney "jumps ship" and takes the client with him, his relationship with the former firm will impact upon the distribution of the fee.
Applying these considerations to the facts of this case illustrates the inequity of the distribution and we are convinced that the "quantum meruit" distribution reached by the purely hourly rate calculated by the trial judge constituted reversible error. The reasoning in the letter opinion of the trial court demonstrates that the trial judge equated quantum meruit to simply factoring the hours spent multiplied by the hourly rate.
*542 The trial court considered the "rainmaker" factor[6] to be a nonissue. Yet, had this case come to a certified trial attorney as a referral, the Evans Firm would be entitled to a division of the fee without regard to services rendered. R. 1:39-6(d). This demonstrates that in addition to normal considerations for reasonable fees as outlined by the Rules of Court, where the fee disputes are between successive lawyers, other considerations must weigh heavily in making fee allocation determinations.
Moreover, the trial court also failed to consider that although Monte worked extensively on the case while he was with the Evans Firm, he was being compensated by them through the efforts of all of the firm's attorneys. Therefore, even if his was the principal input in developing plaintiff's claim, his ability to develop the case was generated while a partner compensated by the Evans Firm. Furthermore, the financial resources of the Evans Firm allowed Monte to fully explore the viability of the claim by obtaining experts and spreading the costs among its partners, subject to RPC 1.8. These expenditures took place while the claim was still questionable. Background work often determines the ultimate success of the claim. An individual firm's willingness to advance expenses of litigation against contingent future recovery is essential to insure that plaintiffs with difficult personal injury claims can obtain counsel. Recognition that a law firm must typically assume such financial risks furnishes much of the fundamental rationale for permitting contingency fees in personal injury actions.
Every firm faces the possibility that one of the individual attorneys assigned to a matter could leave with a substantially prepared case. This risk is unavoidable since clients have unfettered discretion to obtain or release counsel. When a lawyer leaves his law firm, a litigation client may understandably *543 elect to "follow" the person who was most heavily involved with that litigation. This fact of professional life, however, should not deprive the firm whose services the client initially sought from equitably realizing fruits of its reasonable expectancy in the contingent fee. These include, in addition to recognition of the factor of initial attraction of the client, the quality of the firm's initial investment of time, skill and funds in investigation, construction of pleadings, discovery, choice of experts, research and those other foundational services which shape the ultimate result, good or bad, of every lawsuit. It is not just that a lawyer fortuitously assigned to the matter can leave with a substantially prepared case, which is subject only to a wholly contingent obligation for its preparation, limited to reimbursement on an hourly basis, with no recognition given to the factors mentioned above. There should, in any event, be a record developed together with findings of fact, so as to assure that there is both a fair accommodation of client interests and recognition of the true worth of the inception and preparation phase of a litigated matter.
The courts should not foster such behavior in the bar by permitting the defecting attorney to obtain a windfall. Such windfalls are created where, as here, the trial court fails to recognize the value of the initial firm's willingness to risk the time and money to develop the claim. By compensating the original firm solely for time spent, the trial court does not permit that firm to benefit from the risk taken and thereby discourages firms from taking such cases. Hence, we cannot ignore the impact of the trial court's valuation of the Evans Firm's efforts on the class of plaintiffs who seek legal assistance in difficult personal injury cases.
Disputes such as this are best averted by properly drafted partnership and associate agreements. These agreements should contain appropriate language fixing the allocation and apportionment of contingent fees. We find the Monte Firm's argument that in light of R. 1:21-7 the Evans Firm is not *544 entitled to any portion of the contingency fee without merit.[7] The partnership agreement specifically entitled the Evans Firm to a portion of "unbilled work in progress" taken by a departing partner.
We are, however, concerned with the lack of an agreement between the Monte Firm and plaintiff. The Evans Firm's point may be well taken that absent a written agreement between Monte and plaintiff, the Monte Firm is only entitled to quantum meruit for its services. This could persuade us to follow the reasoning of LaBach v. Hampton, 585 S.W.2d 434 (Ky. Ct. App. 1979) (a discharged attorney should be compensated on the basis of the contingent fee agreement, paying the succeeding attorney the reasonable costs of completing the services), and reduce the Monte Firm's compensation. However, since the gross fee has already been adjudicated, we will not disturb the findings.
The facts here clearly indicate the Evans Firm is entitled at the very least to a one-third allocation of the fee. Additionally, the trial court must consider what additional sums may be due the Evans Firm in accordance with the criteria expressed herein.
As to the Monte Firm's cross-appeal concerning prejudgment interest awarded by the trial court in favor of the Evans Firm, the availability of prejudgment interest on a liquidated claim is discretionary. Bak-a-Lum Corp. v. Alcoa Building Products, 69 N.J. 123 (1976). Therefore, we will not disturb the trial court's decision to award such interest.
This matter is reversed and remanded to the trial court for a quantum meruit percentage distribution of the attorneys' fee consistent with this opinion.
NOTES
[1] In 1981 at the time the case was accepted, the firm name was Evans, Koelzer, Marriott, Osborne and Kreizman.
[2] In 1983 at the time the substitution of attorney was filed, the firm name was Monte, Marriott & Nimmo.
[3] Monte signed a partnership agreement with the Evans Firm which provided in part:

1.4 The phrase "termination of all interest in the Partnership" means, when applied to any Partner, the end of (i) his membership; (ii) his units of participation and all rights under his units of participation; and (iii) his rights in the capital of the firm; but shall not involve an elimination or cancellation of any rights expressly provided in this document to receive payments in cash or property yet to be paid to him as an incident of the termination of interests mentioned in (i), (ii) or (iii) of this paragraph.
[4] This example is illustrative of a fair solution:

The beginning point is the determination of the hours expended by both the former and superseding attorneys. Dividing this figure into the total fee, gives an hourly rate and dividing that between the firms based upon the hours worked after reimbursing each of their monetary expenditures gives a ratio between the firms.

 $105,000 fee
 3,000 old firm expenses
 2,000 expenses after attorney leaves firm
 ________
 $100,000 net fee
 150 total hours at old firm
 100 total hours since leaving, prep time & trial
 ___
 250 total hours
 250 = 100% = % 3/5 old firm 2/5 new firm
 60 - 40

The foregoing should be in compliance with RPC 1.5, which sets forth the factors to be considered in the determination of the reasonableness of attorney's fees. In applying those criteria to this example, a 55-45 fee split could result.
[5] This factor is also readily demonstrated by the following example:

X enters the ABC law firm as a partner and brings with him a contingent fee case. While in the firm X spends 200 hours on the case and shortly before the trial leaves the firm. Subsequently, X spends an additional 100 hours on the contingent fee case and ultimately the case returns $300,000 in contingent fees. When X entered the ABC firm, the partnership agreement provided that X would receive 15% of the firm's net profits every fiscal year.
In this hypothetical, two calculations must be made: First, the contingent fee must be split between the law firm and X. In this case, two-thirds of the work put into the case happened while X was in the firm, therefore, ABC is entitled to $200,000 of the fee.
 200 hours 2
 _______________ _
 300 total hours = 3
 2/3 × $300,000 = $200,000
However, X is entitled to his share of that $200,000 as if he were a partner in ABC when ABC received that contingent fee. This, of course, must be arrived at after a factual analysis of the allocated expenses of the ABC firm are deducted from the award.
[6] A reference to the attorney who brought the client to the firm and secured the opportunity for the work to be done.
[7] Although neither party raised the issue, we note that the partnership agreement Monte signed with the Evans Firm calls for arbitration of fee disputes.